IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 2, 2006 Session

## STATE OF TENNESSEE v. TORREZ TALLEY, JEVON BRYANT, AND KEITH EZELL

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-08322-34    Joseph B. Dailey, Judge**

_____

**No. W2003-02237-CCA-R3-CD  - Filed October 16, 2006**

_____

Pursuant to multiple indictments, Defendants Jevon Bryant, Keith Ezell and Torrez Talley were charged with fourteen counts of especially aggravated kidnapping and five counts of aggravated robbery. Defendant Bryant was also charged with one count of felon in possession of a firearm. Following a trial, the jury found Defendants Bryant and Ezell guilty on all counts. The jury found Defendant Talley guilty of ten counts of especially aggravated kidnapping and four counts of aggravated robbery. Thereafter, the trial court sentenced Defendant Bryant to an effective sentence of 364 years, Defendant Ezell to an effective sentence of 198 years, and Defendant Talley to an effective sentence of 140 years. On appeal, the following issues are presented for review: (1) whether the trial court properly denied a motion to suppress physical evidence; (2) whether the trial court properly denied a motion for mistrial during jury selection; (3) whether the trial court properly found purposeful discrimination by the defendants in their exercise of peremptory challenges; (4) whether the trial court erred by failing to require the state prosecutor to elect facts supporting Defendant Bryant's conviction for felonious possession of a handgun; (5) whether the trial court erred in allowing the prosecutor to rehabilitate the credibility of state witnesses; (6) whether the trial court erred in refusing to grant a mistrial or provide curative instruction following an improper statement made by a state witness; (7) whether the trial court erred in allowing the prosecutor to bring in Defendant Ezell's twin brother to rehabilitate a state witness' pretrial misidentification; (8) whether the trial court erred in refusing to grant a mistrial in response to the improper remarks made by the prosecutor during closing argument; (9) whether the trial court erred by refusing to permit counsel to review the jury instructions prior to charging the jury; (10) whether the trial court properly instructed the jury on reasonable doubt; (11) whether the trial court properly instructed the jury on the defendant's right not to testify; (12) whether the trial court erred by refusing to instruct the jury on false imprisonment as a lesser-included offense of especially aggravated kidnapping; and (13) whether the trial court erred in sentencing the defendants. Because we conclude that no reversible error exists, we affirm the judgments of the trial court. However, the record reflects that the defendants' especially aggravated kidnapping convictions were not properly merged. Therefore, we remand for merger and entry of corrected judgments as to those convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Remanded for Merger and Entry of Corrected Judgment**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Marvin E. Ballin, Memphis, Tennessee, for the appellant, Torrez Talley; William Massey and Lorna S. McClusky, Memphis, Tennessee, for the appellant, Jevon Bryant; and James Hale, Assistant Public Defender, for the appellant, Keith Ezell.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jennifer Nichols and Ray Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

The defendants' convictions in this case originate from the commission of especially aggravated kidnapping and aggravated robbery offenses against victims Kimberly Hancock, Omar Coleman, Divin Wright, Oliver Wright, Jerome Carpenter, Tonyell Somerville, and Jodeci Somerville.[1]

The proof presented at trial reflects that Kimberly Hancock was at her home on January 11, 2001, when she received a phone call from a friend requesting she come by and pick up some clothes. After receiving the call, she asked Divin Wright (her boyfriend), and Omar Coleman to accompany her. The group took Omar's white Ford Focus. Upon arrival at the house, Kimberly and Divin went inside to pick up the clothes while Omar waited outside in the car. Inside the house, Kimberly saw Defendant Talley, Thaddeus Brown, John Williams, and Jarvis Williams. As Kimberly proceeded upstairs, John Williams grabbed her by the neck and threw her down the stairs. He then picked her up from the floor, placed her on the couch, and proceeded to question her about her boyfriend's brother, Oliver Wright, whom John Williams believed orchestrated a break-in of his home. Divin was also forced to sit on the couch and questioned about the break-in. The group of men including Defendant Talley threatened to kill Kimberly and Divin if they did not tell them what they wanted to know. Divin was also told to remove his clothes. At this time, Kimberly saw that Defendant Talley and the Williams' brothers had guns.

After Kimberly and Divin were questioned for a few minutes, Thaddeus Brown and Defendant Talley went outside. According to Omar Coleman, he was approached by three armed men and brought into the house under the pretense that he was under arrest. He was then forced to

---

[1] In order to differentiate between the victims in this case, we refer to them by their first names.

-2-

take off his clothes, and his checkbook, credit cards, and drivers license were taken. At this time, Defendant Bryant arrived at the house armed with two guns. Upon arrival, Defendant Bryant brandished his guns and exclaimed, "I want the bitch who set it up." Jarvis Williams told Kimberly that she was going to help find Oliver Wright. Jarvis Williams and Defendant Bryant then forced Kimberly into a black Ford Probe and left. After Jarvis Williams and Defendant Bryant left with Kimberly, Defendant Ezell entered the house wielding a shotgun. Defendants Ezell and Talley then proceeded to beat Divin with their fists and guns.

After Oliver Wright was located, Jarvis Williams called him on the phone and asked if he would pick him up and take him to Auto Zone to get a battery. Oliver agreed. Thereafter, Jarvis Williams and Defendant Bryant met up with Thaddeus Brown and Defendant Ezell. At this time, Kimberly was moved to the backseat of a purple Dodge Intrepid. Defendant Ezell also sat in the backseat, armed with a shotgun. Later, Oliver arrived in a Dodge Neon accompanied by Jerome Carpenter, Tonyell Somerville (Oliver's girlfriend), and Jodeci Somerville ( Tonyell's seven-year-old son). When Oliver and company arrived, Oliver got out of the car. Immediately, Defendants Bryant and Ezell, armed with guns, walked to Oliver's car and told him "[d]on't move. You niggers gonna die tonight."

Both Oliver and Jerome were forced to take off their clothes. Defendant Bryant hit Oliver in the head with a gun after Oliver asked what was going on. Oliver was forced into the trunk of the Intrepid, and Jerome was forced into the trunk of the Neon. In an attempt to get out of the trunk, Oliver put his leg out. While his leg was hanging out, Defendant Bryant closed the trunk on Oliver's leg, breaking it. With Defendant Ezell driving the Neon, the group left the area and drove to a different area of town. Here, Defendant Ezell took Tonyell Somerville's jewelry, cash, and purse. Defendant Ezell then ordered Tonyell and her son, Jodeci, out of the Neon. Before Tonyell left the car, however, Defendant Ezell told her to handover her identification. After Tonyell complied, Defendant Ezell told her that "we've got your ID, we have your address, we know where you live, we know what you look like. If we get caught, if we go to jail, if you call the police, we'll come back and kill you and your son." In the meantime, Jerome was taken out of the Neon's trunk and placed in the Intrepid's trunk with Oliver. A short time later, Kimberly was dropped off near her mother's house. Before being released, she was threatened with death if she called the police. However, both Kimberly and Tonyell called the police after being released.

Meanwhile, the defendants returned to the house with Jerome and Oliver. The defendants, along with the other assailants, placed Oliver and Divin in the middle of the floor and beat them with their fists and guns. Defendant Ezell also struck Omar in the back of the head with his shotgun. In addition to being beaten, Oliver was burned with cigarettes and Divin was burned after being tossed headfirst into a fireplace. The defendants then poured bleach on Oliver, Divin, Omar, and Jerome. The defendants informed these men that they would be taken to Mississippi and killed; whereupon, the defendants forced the men once again into the trunks of their vehicles and started driving toward Mississippi. However, shortly after leaving the house, police officers initiated pursuit, which led to the release of the four men from the confines of the trunks and the eventual arrest of the defendants.

# ANALYSIS

## I. Motion to Suppress

On appeal, Defendant Bryant argues that the trial court erred in denying his motion to suppress a gun found in his possession following his arrest. He argues that the gun should have been suppressed because it was discovered following an unlawful warrantless arrest.

The appellate standard of review for a trial court's conclusions of law and application of law to facts on a motion to suppress evidence is a de novo review. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Notably, however, the trial court's findings of fact are presumed correct unless the evidence contained in the record preponderates against them. *See State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Moreover, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001) (citations omitted).

Both the state and federal constitutions protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7. Therefore, a search or seizure conducted without a warrant is presumed unreasonable and any evidence discovered subject to suppression. *See Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). However, the evidence will not be suppressed if the state proves that the warrantless search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). One of these narrow exceptions occurs when a police officer conducts a search incident to a lawful arrest. *See State v. Watkins*, 827 S.W.2d 293, 295 (Tenn. 1992). Pursuant to Tennessee Code Annotated section 40-7-103(a), a police officer may make a warrantless arrest when he or she has probable cause to believe that the person to be arrested has committed or is committing a felony. *See State v. Lewis*, 36 S.W.3d 88, 97 -98 (Tenn. Crim. App. 2000). Whether probable cause exists depends on whether the facts and circumstances and reliable information known to the officer at the time of arrest were "sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense." *Bridges*, 963 S.W.2d at 491 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

In denying Defendant Bryant's motion to suppress, the trial court made the following findings of fact:

> The officer was informed. He was aware of the crime that had taken place the night before – was informed of suspects to look for and vehicles to look for, and one of the vehicle[s] was a vehicle that was not just a black Ford Probe but I counted seven

particularized facts that were involved in this description that matched the description that led the officer to feel compelled to pull the car over.

> The year of the car.
> The manufacturer, Ford
> The type of car, Probe.
> The color, black.
> Chrome rims.
> Very dark-tinted windows.
> And being in this particular neighborhood
>
> . . . Taking all of these facts together, I think there was sufficient cause to pull the car over.
>
> And then once Mr. Bryant was taken out of the car, things flowed from there.

. . .

A review of the record in this case supports the trial court's ruling. The record reflects that the day after the occurrence of the kidnapping and robbery offenses, the police were in search of the suspects. These police officers were given information about the suspects from the victims. The information given to the investigating officers named Defendant Bryant as a suspect. In addition, the investigating officers were told to look for a "94/95 Ford Probe, black with chrome rims, [and] dark-tinted windows." These police officers were also given locations where the suspects might be found. While investigating one of these locations, a black Ford Probe with chrome rims and dark-tinted windows drove by. Observing that the Ford Probe matched the description given, the police officers stopped the vehicle. Once the vehicle was stopped, Defendant Bryant's identity as a suspect was confirmed and he was arrested. Upon arrest, the officers conducted a search of the Probe and discovered a gun in the backseat. As previously noted, a police officer may conduct a warrantless arrest and subsequent search incident to the arrest if there exists probable cause to believe that the individual arrested has committed a felony. Here the evidence does not preponderate against the trial court's finding that police had probable cause to arrest Defendant Bryant. Accordingly, the trial court properly denied the defendant's motion to suppress, and the issue is without merit.

## II. Mistrial: Voir Dire

Defendants Bryant, Ezell, and Talley argue that the trial court erred in denying their request for a mistrial based upon statements made by one of the prospective jurors during voir dire. Specifically, they argue that the juror's statements regarding the kidnapping and murder of his sister-in-law evoked sympathy in the venire panel thereby preventing an impartial verdict.

During voir dire, a prospective juror related that his sister-in-law had been kidnapped and murdered in 1985. Providing some detail, this prospective juror mentioned the fact that his sister-in-

law had been shot and placed in the trunk of a car where she bled to death. The juror further remarked that the criminals were convicted but given probation. Upon hearing these circumstances, the trial court excused the juror from serving on the jury.

After the prospective juror had been excused, the defendants requested a mistrial. The trial court denied the request stating,

> I don't think that's necessary. I think I can give a curative instruction . . . we're just beginning voir dire, so everybody will have an opportunity to address the jurors and make sure that they render their verdict solely on the proof that's presented in court this week. We will hear a variety of things in voir dire. I guess, to one degree or another, they have the potential for creating the very problem that you're concerned with; and I just think that the appropriate curative instructions can cover that.

The trial court then informed the defendants that instructions would be given later in effort to avoid drawing attention to the prospective juror's remarks. At the end of the day, the court gave the following instruction to the remaining members of the venire:

> [A]s I indicated earlier in my remarks, once you're selected to serve on this jury . . . [your] decision must be based solely on the proof that you hear in court from this witness stand to my right and the exhibits that are introduced [through] witnesses and on the law that I'll provide you with at the end of the trial. And your decision is not to be based on anything that you may hear in the newspapers, anything you may have experienced or seen or heard in the past; or, for that matter, anything that the lawyers say. . . . The only evidence on which you base your verdict . . . is the proof that comes in from this witness stand to my right through sworn testimony and by way of exhibits that also might be introduced.

Upon review, we note that the decision of whether or not to grant a mistrial rests within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Id*. A manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. Crim. App. 1981). The defendant bears the burden of establishing a manifest necessity. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). This court will not disturb the trial court's decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

In the instant case, the record reflects that the prospective juror was discretely dismissed for cause and his statements were not emphasized. The record further reflects that the trial court provided curative instruction reminding the venire of their duty to be fair and impartial and reach a

verdict based solely on the evidence. In addition, the record reflects that both the prosecutor and defense counsel impressed upon the jury the presumption of innocence afforded to the defendants and the fact that the state had the burden of proving all elements of each offense beyond a reasonable doubt. In contrast, other than speculation regarding the effect, if any, the prospective juror's statements had on the members of the venire, the defendants have not shown that the prospective juror's statements unduly influenced the venire so as to require a mistrial. Therefore, we conclude that the trial court did not abuse its discretion in denying the defendants' request for a mistrial. This issue is without merit.

### III. Peremptory Challenges

Defendants Bryant and Talley argue that the trial court improperly applied *Batson v. Kentucky*, 476 U.S. 79 (1986) in determining the defendants could not exercise their peremptory strikes against certain prospective jurors. The defendants also complain that the overall tenor of the trial court's actions in its *Batson* ruling demonstrated disparate treatment of the defendants relative to the prosecution.

"Peremptory challenges, along with challenges for 'cause,' are the principal tools that enable litigants to remove unfavorable jurors during the jury selection process." *United States v. Annigoni*, 96 F.3d 1132, 1137 (9th Cir. 1996). "The central function of the right of peremptory challenge is to enable a litigant to remove a certain number of potential jurors who are not challengeable for cause, but in whom the litigant perceives bias or hostility." *Id.* "The function of the [peremptory] challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." *Swain v. Alabama*, 380 U.S. 202, 219 (1965), *overruled on other grounds, Batson*, 476 U.S. 79; *see also State v. Spratt*, 31 S.W.3d 587, 598 (Tenn. Crim. App. 2000).

However, under the Equal Protection Clause of the Fourteenth Amendment, neither the state prosecutor nor the defendant may exercise a peremptory challenge to remove a prospective juror solely on the basis of race. *Batson*, 476 U.S. at 89-90; *see also Georgia v. McCollum*, 505 U.S. 42, 59 (1992); *Spratt*, 31 S.W.3d at 596 (noting that the prosecutor may lodge a "reverse *Batson*" objection to the defendant's challenge of jurors on the basis of race). In *Batson v. Kentucky*, the United States Supreme Court established a three-step process for evaluating alleged discrimination in jury selection. First, the opponent of the peremptory challenge must establish a prima facie case of purposeful discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93-94; *see also Johnson v. California*, 545 U.S. 162, 125 S. Ct. 2410, 2416 (2005). Second, if the trial court determines that a prima facia showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the challenge. *Batson*, 476 U.S. at 97-98. The race-neutral explanation need not be persuasive or even plausible. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Unless purposeful discrimination is inherent in the explanation, the reason offered will be deemed race neutral. *See id.* Finally, if the proponent provides a race-neutral explanation, the trial court must then determine, from all the circumstances, whether the explanation is a pretext and whether

the opponent of the peremptory challenge established purposeful discrimination. *See Batson*, 476 U.S. at 98; *see also Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 2325 (2005). If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. *See State v. Hugueley,* 185 S.W.3d 356, 369 (Tenn. 2006); *Woodson v. Porter Brown Limestone Co., Inc.*, 916 S.W.2d 896, 903 (Tenn. 1996). Determination of discriminatory intent or lack thereof turns largely on the evaluation of credibility, of which the attorney's demeanor is often the best evidence. *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994).

When determining the existence of a *Batson* violation, the trial court must meticulously and carefully articulate specific reasons for each finding on the record, "i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." *Woodson*, 916 S.W.2d at 906. On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." *Id*.

The record indicates that during the third day of voir dire, defense counsel for Defendant Talley complained that the prosecutor had used six of its nine challenges to excuse African American jurors.[2] In response, the trial court pointed out that the prosecutor had challenged Caucasians and stated that there had been no threshold showing of purposeful discrimination. Shortly thereafter, the prosecutor complained that the defense had collectively violated *Batson* by striking "thirteen or fourteen" Caucasian jurors. In response, the trial court determined that the defense had actually exercised peremptory challenges against twelve Caucasians and two African Americans "out of the sixteen or eighteen that they've used." The trial court then denied the prosecutor's "request to get into a Batson-type explanation of why the [defense] challenges [were] being used."

The court then recessed for lunch. After lunch, counsel for Defendant Talley peremptorily challenged Juror Lamb, while counsel for Defendant Ezell challenged Juror Morgan. Both jurors were excused. During another round of challenges, counsel for Defendant Bryant challenged Juror Jackson and she was excused. At this time, the prosecutor requested a bench conference. During this bench conference, the trial court called for a recess and made the following observations outside the presence of the jury:

> [Earlier] I made the observation – which is the last time I'll make this observation – that I didn't perceive there to be any Batson problem . . . based on what had transpired thus far; and then quickly – promptly – apparently that was a green light because then Mr. Lamb was challenged, Mr. Morgan was challenged, Ms. Jackson was challenged. I mean, right down the line with hardly any hesitation at all, these challenges start flowing in, and I just think the defense has now exercised

---

[2] We note that the peremptory challenge forms used were not included in the record. Instead, the parties argue this issue based upon the trial transcript.

twenty-one of twenty-four possible challenges – three against African Americans and eighteen against Caucasians, by my count.

Without waiting for the trial court's ruling on the issue, counsel for Defendant Talley interjected that he struck Juror Lamb because of his educational background. Talley's counsel added that he thought this juror would be more inclined to convict. Upon these remarks, the court asked Defendant Ezell's counsel for his reason for striking Juror Morgan. Ezell's counsel responded that he was not comfortable with the juror's response regarding application of the presumption of innocence. The court then asked counsel for Defendant Bryant his reason for excusing Juror Jackson. Bryant's counsel stated that he challenged Juror Jackson due to her lack of jury experience and the fact that she watched the television show "Law & Order," which counsel believed was a "prosecution-oriented show."

In response, the trial court rejected the reasons behind each of these peremptory challenges, finding them to be "totally erroneous" and "meaningless." The court then observed that Jurors Lamb and Morgan had already left the courthouse and therefore could not be re-seated. However, the court ordered Juror Jackson to be re-seated. Counsel for Defendant Bryant then moved for a mistrial, again arguing that the prosecutor was also in violation of *Batson* by her exercise of nine peremptory challenges against prospective African American jurors. The trial court denied the motion, finding no prima facia showing of purposeful discrimination by the prosecutor. The court noted that while the prosecutor had used nine of twelve peremptory challenges to exclude African Americans from the jury, the defense collectively had exercised eighteen of twenty-one challenges to exclude Caucasians from the jury. The trial court stated that "the defense is twice as culpable, if you will, in the Batson sense." The court further found that after it made the ruling that no prima facia case of discrimination had been made by either party, the defense immediately exercised their peremptory challenges to exclude three Caucasian jurors. The court noted, however, that the prosecutor did not "seize on that opportunity to start excusing African Americans" and did not excuse anyone in the past four rounds. As such, the trial court found that there was "no parallel. . . between the manner in which the peremptories were exercised by the two sides of counsel table."

Subsequently, defense counsel for Defendant Bryant attempted to dismiss Juror Bartlett. Outside of the venire's presence, Bryant's counsel stated that he desired the dismissal of Juror Bartlett because she watched "Law & Order," she did not have jury experience, and her demeanor suggested that she was not receptive to the defense. The trial court responded, stating the following:

> I have determined that there has been a threshold showing of discriminatory use of peremptory challenges by the defense. Therefore, you were correct in assuming that I would have required the articulation of race-neutral reasons to challenge Ms. Bartlett. The three reasons that you have advanced, again . . . I don't find them to be valid, race-neutral reasons. The fact that [a juror] watches a particular TV show that many others on the jury raised their hands to – including several African Americans – does not give right to challenging her unless you're willing and prepared to challenge African Americans for the same reasons.

. . . .

Ms. Bartlett, like Ms. Jackson, has answered all of the questions appropriately. She's been very responsive, very attentive. She's indicated a desire and willingness to serve on this case. I see absolutely no reason why she, as a citizen, should not be allowed to serve on this jury absent some valid race-neutral reason that can be articulated as to her that would not also be applicable to most – or many other jurors. And again, I don't find these three [reasons] that were advanced to be valid, race-neutral reasons . . . and I'll deny your request to excuse her.

As a threshold matter, we must note that appellate review of this issue is frustrated, in part, because the trial court failed to meticulously follow the *Batson* procedures and clearly articulate its findings and conclusions on the record. However, given the high deference we are to accord the trial court's findings that are present in the record, we cannot say that the trial court erred in its application of *Batson*.

After review of the record available to us, we are persuaded that the trial court found prima facia evidence of discrimination by the defense. Although the record contains confusing colloquy on this point, it appears that during the jury selection process, the trial court found that the defense repeatedly exercised peremptory strikes against Caucasians and had collectively exercised eighteen challenges out of twenty-one against this racial group. Notably, a prima facia case of purposeful discrimination may be established solely on evidence relating to the exercise of peremptory challenges so long as the evidence gives rise to an inference of discriminatory purpose. *See Batson*, 476 U.S. at 96-97. While a pattern of strikes against a particular racial group is not required to prove discrimination, it certainly is significant because it may give rise to the inference of discrimination. *See id*. at 97.[3]

Next, the record reflects that the trial court rejected the reasons proffered by the defense, and concluded that the defense was collectively excluding prospective jurors on the basis of race. Addressing one of the defense attorney's proffered reasons for excluding two prospective jurors (they watched Law & Order), the trial court observed that the reason for excluding these prospective jurors applied equally to African Americans whom the defense did not challenge for the same reason. *See, e.g.*, *Miller-El*, 125 S. Ct. at 2325 (noting if proffered reason for excluding a juror applies just as well to an otherwise-similar juror of a different race not excluded, that is evidence tending to prove purposeful discrimination). Therefore, it appears that while the defense attorneys offered race-neutral reasons, the court, after observing firsthand the demeanor of the defense attorneys and prospective jurors, the racial composition of the venire, and the circumstances involved in the peremptory challenges, determined that purposeful discrimination occurred. The rule in *Batson* provides an opportunity to give a reason for striking a juror but "it requires the judge to assess the

---

[3] "An 'inference' is generally understood to be a 'conclusion reached by considering other facts and deducing a logical consequence from them." *Johnson v. California*, 545 U.S. 162, 125 S. Ct. 2410, 2415 n. 4 (2005) (quoting Black's Law Dictionary 781 (7th ed. 1999).

plausibility of that reason in light of all evidence with a bearing on it." *Id*. at 2331. Accordingly, after examining the available facts present in the record, we see no clear indication that the trial court erroneously applied *Batson* to deny the defense use of two peremptory challenges. The defendants are not entitled to relief on this issue.

### IV. Election of Offenses

Defendant Bryant argues that the trial court erred in failing to require the prosecution to elect between seeking a conviction for felonious possession of a handgun on January 11, 2001, or on January 12, 2001. In support of his argument, the defendant points to places in the trial record where the victims testify that Defendant Bryant had two big guns on the 11th, and one place in the record where a police officer testified that upon the arrest of Defendant Bryant on the 12th, he removed a gun from a car Defendant Bryant was driving.

Upon review, we note that "the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001). When the proof shows the commission of multiple acts with multiple results, the results being separate criminal offenses, and there are insufficient counts in the charging instrument to accommodate all of the offenses shown, the usual precaution to assure jury unanimity is to require the election of offenses. *See Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973); *State v. Clabo*, 905 S.W.2d 197, 205 (Tenn. Crim. App. 1995). The election requirement "safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Johnson*, 53 S.W.3d at 631. In addition, the election requirement enables a defendant to prepare for a specific charge, protects a defendant against double jeopardy, enables the trial court to review the weight of the evidence in its capacity as thirteenth juror, and enables the appellate court to review the legal sufficiency of the evidence. *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001). Because the election requirement is "fundamental, immediately touching the constitutional rights of an accused," an election of offenses is mandated whether or not the defendant requests an election. *Burlison*, 501 S.W.2d at 804. Failure of the state to elect offenses when the proof requires an election is considered an error of constitutional magnitude and will result in reversal of the conviction, absent the error being harmless beyond a reasonable doubt. *See State v. Shelton*, 851 S.W.2d 134, 137-38 (Tenn. 1993).

In our view, Defendant Bryant's argument regarding election of offenses is misplaced and without merit. Here, the record reflects that the prosecution charged Defendant Bryant with one count of felon in possession of a handgun on January 11, 2001, and presented proof at trial pertinent to this charge. The testimony from the various victims indicate that Defendant Bryant possessed two guns the night of January 11, 2001. Also, the prosecutor's closing argument includes a statement to the jury that Defendant Bryant had a previous felony conviction and "on January 11, 2001, he came to that location with two pistols. All of our victims [testified] consistent with him having two firearms." In addition, the trial court instructed the jury when rendering their verdict to inquire

-11-

whether Defendant Bryant is "guilty of convicted felon in possession of a handgun as *charged in the indictment*."

Although the defendant cites one instance where a police officer testified about seizing a gun from the vehicle Defendant Bryant was driving on January 12th, we do not view this testimony as evidence of a second offense involving a felon in possession of a firearm. *See, e.g.*, *State v. Cayle Wayne Harris*, No. M2004-00049-CCA-R3-CD, 2005 WL 2255488, at *16 (Tenn. Crim. App., at Nashville, Aug. 23, 2005) (noting that where the offense is testified to with particularity, minor references to other instances of offenses are harmless in the context of the election requirement); *State v. William Darryn Busby*, No. M2004-00925-CCA-R3-CD, 2005 WL 711904, at *7 (Tenn. Crim. App., at Nashville, Mar. 29, 2005); *State v. Darrell Dodson*, M1998-00067-CCA-R3-CD, 2000 WL 378347, at *7 (Tenn. Crim. App., at Nashville, Apr. 14, 2000). Instead, the police officer's testimony was simply corroborative of the victims' testimony that Defendant Bryant was in illegal possession of a firearm on January 11th. However, even if the police officer's testimony necessitated an election of offenses, it is clear from the record that any error was harmless beyond a reasonable doubt. As illustrated above, the indictment was time-specific and the prosecutor's case-in-chief and closing argument focused on the offense charged in the indictment. Therefore, the jury was in no danger of rendering a patchwork verdict. *See State v. Anthony Allen*, No. W2004-01085-CCA-R3-CD, 2005 WL 1606350, at *14 (Tenn. Crim. App., at Jackson, July 8, 2005) (noting the direction of proof and designation of offense in closing argument served as election of offense); *State v. Michael J. McCann*, No. M2000-2990-CCA-R3-CD, 2001 WL 1246383, at *5 (Tenn. Crim. App., at Nashville, Oct. 17, 2001) (holding that summation of offenses during prosecutor's closing argument may effectively serve as an election of offenses); *State v. William Dearry*, No. 03C01-9612-CC-00462, 1998 WL 47946, at *13 (Tenn. Crim. App., at Knoxville, Feb. 6, 1998). Defendant Bryant is not entitled to relief on this issue.

## V. Rehabilitation of Witnesses

Defendant Bryant argues that the trial court erred by permitting the state prosecutor to use a transcript to improperly bolster the credibility of witnesses, Divin Wright and Tonyell Somerville.

Ordinarily, extrinsic evidence of a prior consistent statement is not admissible to bolster the credibility of a witness. *See State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998); *State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (noting that prior statements of witnesses whether consistent or inconsistent constitute inadmissible hearsay evidence if offered for the truth of the matter asserted). However, a prior consistent statement may be admissible when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness' testimony was either fabricated or based upon faulty recollection. *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). Also, a prior consistent statement may be admissible when a witness' prior statement is used out of context to cross-examine the witness. *See State v. Boyd*, 797 S.W.2d 589, 593-94 (Tenn. 1990). Before a prior consistent statement may be admissible, "the witness' testimony must have been assailed or

attacked to the extent that the witness' testimony needs rehabilitating." *Hodge*, 989 S.W.2d at 725.

## *A. Divin Wright*

The record reflects that Divin Wright testified that Defendant Jevon Bryant pulled out two guns and pointed them at his head. The record also reflects that during his trial testimony Divin referred to Defendant Bryant as "Red Von." Subsequently, defense counsel cross-examined Divin about a statement he made at a preliminary hearing where he said that Defendant Bryant had "pulled out two knives." At this time, the following discussion took place:

Divin: I didn't say anything about a knife. How could I get a knife and a gun mixed up.

Defense: That's what I was asking you. How could you get a knife and a gun mixed up?

Divin: I didn't.

Thereafter, on re-direct, the prosecutor asked Divin the following about his prior statement:

Prosecutor: Now, [defense counsel] asked you how come you said . . . that Jevon Bryant pulled out two knives. Now, did you say that?

Divin: No, I never said two knives; I said two nines.

Prosecutor: Two nines. And in the preliminary hearing, you stand up at the bench with a tape recorder, right?

Divin: Right.

Prosecutor: There's not a court reporter . . . in those preliminary hearing, is there?

Divin: No, ma'am.

In addition, the prosecutor noted that the preliminary hearing transcript recorded Divin calling Defendant Bryant "Red Barn." The prosecutor asked Divin if he had ever called Defendant Bryant "Red Barn." Divin responded that he was positive that he did not call Bryant "Red Barn."

The defense objected. In response, the trial court overruled the objection and stated the following:

Two knives is what [defense counsel] was alluding to in the unsigned preliminary hearing transcript. And then the . . . rehabilitation – whatever you want

-13-

to call it – was made on redirect suggesting that it was actually two nines that was said instead of two knives.

> . . . .

> And to illustrate how easily those types of mistakes can be made in a preliminary hearing trancript [sic] where there is no official court reporter when nothing is ever signed . . . [the prosecutor] was further asking him about a point . . . where he alluded, on the transcript to Red Barn as opposed to Red Von . . . .

> . . . .

> But the point of the matter is, [the prosecutor] is perfectly entitled, on redirect, to rebut that or clarify that [inconsistent statement] in any legitimate manner that she has at her disposal. And to suggest that there are other similar types of confusions – Red Barn vs. Red Von – crystalizes the type of confusion that occurs when you have these unofficial/ unsigned transcripts typed up by some secretary in some office [listening] to some scratchy tape that was made down in general sessions court two months earlier. . . . It was a very significant point that you [defense counsel] were making, in your cross examination, regarding two knives. And the manner in which you made that point in front of the jury made it appear as though it was a very significant point. . . .

Upon review, we discern no error. Here, the defense, on cross-examination, attacked Divin Wright's credibility by insinuating he had previously testified that Defendant Bryant possessed knives, not guns. However, contrary to Defendant Bryant's argument, the prosecutor did not introduce a prior consistent statement to rebut this impeachment. Instead, through redirect examination of Divin, the prosecutor rebutted the attack by denoting the fact that the transcript contained possible typographical errors in Divin's former testimony; thus, soliciting an explanation supporting the witness' denial of the alleged inconsistent statement. The scope of redirect examination is within the trial court's discretion and will not be reversed absent an abuse of that discretion. *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). In our view, the purpose of redirect examination is to clarify the testimony of a witness and to rehabilitate a witness whose credibility has been impeached. *See, e.g.*, *State v. Chearis*, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999); *Meeks*, 867 S.W.2d at 375. *See also* Neil P. Cohen et al., Tennessee Law of Evidence, § 6.11[6] (5th ed. 2005). Accordingly, we conclude that the trial court did not abuse its discretion by allowing the prosecutor to rehabilitate Divin on redirect examination.

### *B. Tonyell Somerville*

The record reflects that defense counsel, through cross-examination, highlighted several variances between Tonyell Somerville's prior statement to police and her trial testimony. Through this line of questioning, the defense aptly called into question Tonyell's credibility. On redirect, the prosecutor attempted to rehabilitate by having Tonyell read aloud her entire two-page statement to

police. The defense objected. In response, the trial court overruled the objection and stated the following:

> Clearly, on direct examination, the state cannot have their witness . . . read from their prior consistent statement. We all agree to that. But if that prior statement was used for impeachment purposes on cross examination, then there is some latitude given on redirect to come back and rehabilitate. The only question is how much rehabilitation is appropriate in this instance. In [this] case . . . the witness' credibility is at stake . . . . I think that, as a matter of fundamental fairness, the state ought to be able to have [Tonyell] read what the answer was so it can all be viewed in [its] proper context. . . .

Upon review, we discern no error. We note that "a direct contradiction is not necessary for a statement to be inconsistent, and it is sufficient if the inconsistency has a reasonable tendency to discredit the witness' testimony." *State v. Hall*, 976 S.W.2d 121, 150 (Tenn. 1998) (Appendix). Here, the defense used portions of Tonyell's prior statement to attack her credibility. "Where specific questions and answers taken out of context do not convey the true picture of the prior statement alleged to be inconsistent, it is unfair to permit reference to isolated, unexplained responses by the witness and there is no error in allowing the statements to be placed in context." *Boyd*, 797 S.W.2d at 594. Accordingly, the trial court did not abuse its discretion by allowing the witness' statements to be placed in context.

## VI. Mistrial: Improper Witness Statement

Defendant Bryant argues that the trial court erred in denying his motion for mistrial after a police officer interjected his personal opinion as to the guilt of the defendant.

At trial, Police Officer Eric Kelly testified to events surrounding the stop and arrest of Defendant Bryant. While testifying to these events, Officer Kelly responded to the following questions:

> Prosecutor: Did you ever arrest Jevon Bryant or . . . detain him?
>
> Officer Kelly: Yes, sir, he was detained.
>
> Prosecutor: And where was he taken?
>
> Officer Kelly: At the moment that we realized – that after speaking with him that he had been involved – possibly involved in a particular crime –

At this time, defense counsel objected. The trial court responded with the following:

-15-

He rephrased his answer and said – when we thought he was possibly involved –
before he rephrased it, it was objectionable, but he rephrased it, so let's move on.
Obviously, he thought [Defendant Bryant] was involved if he arrested the guy. That's
no big surprise. . . .

The court then denied Defendant Bryant's motion for a mistrial, but noted that the defense could
"get back into it on cross" if they so desired.

As previously noted, the decision of whether or not to grant a mistrial rests within the sound
discretion of the trial court. *McKinney*, 929 S.W.2d at 405. The purpose of a mistrial is to correct
the damage done to the judicial process when some event has occurred which would preclude an
impartial verdict. *Arnold*, 563 S.W.2d at 794. This court will not disturb the trial court's decision
unless there is an abuse of discretion. *Adkins*, 786 S.W.2d at 644; *State v. Williams*, 929 S.W.2d
385, 388 (Tenn. Crim. App. 1996). When determining whether a mistrial is necessary after improper
testimony is presented to the jury, this court has considered the following non-exclusive factors: (1)
whether the improper testimony was elicited by the state, (2) whether the trial court gave a curative
instruction; and (3) the relative strength or weakness of the state's proof. *See State v. Larry Holmes*,
No. W2004-01576-CCA-R3-CD, 2005 WL 1656830, at *10 (Tenn. Crim. App., at Jackson, July 15,
2005), *perm. app. denied* (Tenn. Dec. 19, 2005); *State v. Paul Hayes*, No.
W2001-02637-CCA-R3-CD, 2002 WL 31746693, at *4 (Tenn. Crim. App., at Jackson, Dec. 6,
2002), *perm. app. denied* (Tenn. May 27, 2003).

Upon review, we discern no reversible error necessitating a mistrial. Contrary to Defendant
Bryant's assertions, Officer Kelly's statement – "we realized that – after speaking with him that he
had been involved – possibly involved in a particular crime" – is not an overreaching, egregious
statement about Defendant Bryant's guilt. Rather, this statement amounts to no more than a benign
explanation as to why Officer Kelly arrested Defendant Bryant as a suspect. We note that Officer
Kelly corrected his own statement; thereby, correcting any scintilla of possible prejudice inherent
in the statement. As such, no curative instruction was necessary. Finally, we note that prior to
Officer Kelly's testimony, several witnesses, including the victims in the case, testified that
Defendant Bryant was involved in the crimes for which he was on trial. Indeed, the record reflects
that the state presented strong evidence of Defendant Bryant's guilt. Accordingly, we conclude that
Defendant Bryant failed to establish that the trial court abused its discretion when it denied his
request for a mistrial. This issue is entirely without merit.

## VII. Identification of Defendant Ezell

Defendant Keith Ezell argues that the trial court erred in allowing the state prosecutor to
bring his twin brother into the courtroom in order to explain Oliver Wright's initial pretrial
misidentification. In making his argument, the defendant states that "there appears to be no
published authority on this question," but respectfully urges this court to determine the in-court
comparison overly suggestive and fundamentally unfair.

In the instant case, the record reflects that Oliver Wright identified Defendant Keith Ezell in-court as a participant in the charged criminal activity. In doing so, Oliver referred to Defendant Ezell as "Twin." On cross-examination, Oliver acknowledged that he identified the wrong person, Kenneth Ezell, at his initial interview with police at the hospital. On redirect examination, Oliver explained that the photographic array shown to him at the hospital contained a picture of Kenneth Ezell, but not Keith. As a result, he selected Kenneth's photograph believing it to be a photograph of Keith. At this time, the trial court, over the defense objection, allowed the prosecutor to bring Kenneth Ezell into the courtroom; whereupon, Oliver reiterated that Keith Ezell, known to him as "Twin," was the individual responsible for the charged criminal activity.

To begin, we note that Defendant Ezell has failed to cite any authority for his argument. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7). However, notwithstanding waiver, the defendant is not entitled to relief on the merits of this issue.

Because Defendant Ezell did not articulate a specific evidentiary basis for his objection, we perceive the issue as one that touches upon the scope of redirect examination. We therefore review for abuse of discretion. *See Barnard*, 899 S.W.2d at 624. As previously noted, the purpose of redirect examination is to clarify the testimony of a witness and to rehabilitate a witness whose credibility has been impeached. As with the admission of any evidence, testimony elicited during redirect is governed by evidentiary rules of relevance. *See, e.g.*, Tenn. R. Evid. 401 & 403. Therefore, trial courts should be mindful of the need to limit credibility bolstering evidence to that which they determine will not unduly prejudice the opponent of such evidence.

In this case, Oliver's credibility was impeached. By impeaching Oliver's credibility concerning his earlier misidentification, Defendant Ezell's counsel opened the door to the presentment of Defendant Ezell's twin brother and subsequent examination designed to rehabilitate Oliver's credibility. This approach was relevant to Oliver's prior misidentification. In addition, in cases where the identification of a defendant is at issue, we have determined that the trial court has discretion to allow a jury to view certain aspects of a defendant's physical appearance, such as tattoos or scars. *See State v. Alejandro Rivera*, No. E2002-00491-CCA-R3-CD, 2003 WL 22843170, at *20 (Tenn. Crim. App., at Knoxville, Dec. 1, 2003); *see also State v. Henderson*, 623 S.W.2d 638, 641 (Tenn. Crim. App. 1981). As such, given the circumstances, we determine that any possible prejudice caused by the presentment of Defendant Ezell's twin brother did not substantially outweigh its relevance. *See* Tenn. R. Evid. 403. Accordingly, we conclude the trial court did not abuse its discretion in allowing the state to rehabilitate Oliver's credibility with respect to his initial misidentification of Defendant Ezell.

## VIII. Prosecutorial Misconduct

Defendant Bryant argues that the trial court erred when it denied his motion for mistrial based upon improper closing arguments by the state prosecutor. The defendant cites six specific comments

alleged to be inflammatory and improper. The state counters that since the defendant never properly registered a contemporaneous objection to two of the prosecutor's comments, he has waived his claim of error for these particular comments.[4] The state further contends the prosecutor's comments were either proper or did not prejudice the jury's verdict.

The complained of comments made by the prosecutor during rebuttal closing argument are as follows:

> I submit the reason you're here . . . is because those three men and their . . . codefendants . . . set about to terrorize another group of people, and they did it. And those people – three of which are sitting right here – are broken. They [are] broken today by what happened eighteen months ago. So, *in that sense, you won. You didn't get to finish, but you won. . . .*
>
> *So you won. They're scared.*
>
> . . . .
>
> As I was saying, *the only bad thing that will happen in this courtroom today is if robbers and kidnapers are set free. And on behalf of the State of Tennessee, I submit that would be a travesty.*
>
> *You can't, like Humpty Dumpty, put it back together for them. You can't fix it for any of them because you can't wipe their slate clean.* You can't take the memory that will live with those people out of their minds. But what you can do is lift the facts that you have, and with the law that [the court] is going to read you, apply the law to those facts, consult with one another, and find the defendants guilty as charged.
>
> *Now, by law . . . [the court] has to give you what's called lesser-included offenses. . . .*
>
> . . . .
>
> Again – and I apologize – as I was saying, "By law the judge has to charge you with these lesser-included offenses. And you will hear the lesser-included offenses of especially-aggravated kidnaping [sic] are aggravated kidnaping [sic] and

---

[4] We note that the state is correct that the defense failed to contemporaneously object to two of the prosecutor's comments alleged to be prejudicial. However, given the fact that these two comments were of the same character as those objected to and were made by the prosecutor immediately following an overruled objection by the defense, this court, in the interest of justice, will review all six comments.

kidnaping [sic]. You will hear the lesser-included offense of aggravated robbery is robbery.

. . . .

And those instructions will be included in the charge.

Let's look at the defendants individually.

. . . .

And [defense counsel] has spent a lot of time talking about . . . Mr. Bryant['s] . . . tattoos on his arms . . . well, *No.1, in January, 2001, the evidence was, from everybody, that they were all wearing coats.*

. . . .

On January 11th, *hatred, vengeance, and evil came calling*, and there are seven lives who are changed forever, including Omar, Oliver, and Divin. You were selected to sit on this jury . . . because of the faith we have in your individual abilities to do this job. And as an assistant D.A., when you get to know people like your victims, it's hard to turn a case over to you. But that's part of our job too. . . . You have every scrap of information that you need. Do the right thing in this case.

(Emphasis added for clarification purposes).

It has long been recognized that closing argument is a valuable privilege that should not be unduly restricted. *See State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (citing *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994)). However, closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999). Notably, the scope of closing argument is subject to the trial court's discretion and will not be reversed absent a clear showing of abuse of discretion. *See State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998); *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

The prosecutor plays a unique and significant role in our criminal justice system. As aptly stated:

[The prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed he should do so. But, while [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is

-19-

to use every legitimate means to bring about a just one. It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

*Berger v. United States*, 295 U.S. 78, 88 (1935); *see also Judge v. State*, 539 S.W.2d 340, 344-45 (Tenn. Crim. App. 1976).

While not exhaustive, we have previously recognized five areas of misconduct in closing argument:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
2. It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted). When determining whether the prosecutor's misconduct constitutes reversible error, this court considers whether the conduct was so improper or the argument so inflammatory that it prejudicially affected the jury's verdict. *See Middlebrooks,* 995 S.W.2d at 559*; Goltz*, 111 S.W.3d at 5. In measuring the prejudicial affect of an improper argument, this court considers the following factors: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." *Goltz*, 111 S.W.3d at 5-6.

We begin our review by addressing the prosecutor's comment on lesser-included offenses. Here, Defendant Bryant complains that the prosecutor's comments demeaned the significance of the fact that the law required jury instruction on lesser-included offenses. The record reflects that the trial court in overruling the defendant's objection found that the prosecutor's comment amounted to nothing more than a correct statement of the law. We agree. Looking at the record, we find that the prosecutor's remarks served only to emphasize the trial court's charge to the jury and fell within the range of permissible argument. As such, we discern no error.

Next, Defendant Bryant complains that the prosecutor blatantly argued a fact not in evidence by asserting he was wearing a coat the night the crimes took place. In an effort to place the prosecutor's comment in context, we note that prior to the prosecutor's rebuttal argument, counsel for Defendant Bryant argued that the victims lacked credibility in their identification of Defendant Bryant stating, "what are the odds that six people would look at this man right here and be asked . . . to describe him, and not talk about tattoos?" Then, during rebuttal argument, the prosecutor made the comment that the defendants, including Defendant Bryant, were wearing coats when they committed the crimes.

Although the record does not support the prosecutor's comment, we are not convinced that this comment was so erroneous as to require reversal. First, the prosecutor's comment does not appear to be deliberate. The record reflects that the prosecutor believed there was testimony that Defendant Bryant wore a coat. Second, the record indicates the prosecutor's comment was immediately objected to, and although the defendant's objection was overruled, the prosecutor attempted to cure this earlier comment by acknowledging to the jury that they were to decide whether or not the witnesses properly identified Defendant Bryant despite their failure to mention his tattoos. Third, in its charge, the trial court reminded the jury that statements and arguments of counsel were not evidence and could be disregarded if not supported by the evidence. Fourth, the record reflects that many if not all of the victims identified Defendant Bryant in court as one of the assailants. Accordingly, the prosecutor's comment, albeit error, does not rise to the level of reversible error.

We next address the prosecutor's remaining comments alleged to have prejudiced the jury's verdict. Here, Defendant Bryant argues that the prosecutor's comments were grossly improper. In particular, Defendant Bryant points out that during rebuttal argument, the prosecutor, after reiterating that the victims were terrorized, directly addressed the defendants, stating, "you won. They're scared." Thereafter, the prosecutor declared to the jury that it would be a travesty to let these robbers and kidnappers go free. The prosecutor then urged the jury to find the defendants guilty. Then later, the prosecutor personified the defendants as "hatred, vengeance, and evil" and again appealed to the jury's passions by saying "it's hard to turn a case over to you" so "[d]o the right thing in this case." Defendant Bryant also points out that no curative measures were undertaken by the trial court.

Looking at the record, it is evident that the prosecutor's comments were improper in that they were designed to inflame the passions and prejudices of the jury. It is well settled that a prosecutor should refrain from argument designed to inflame the jury and should restrict his or her commentary to matters in evidence or issues at trial. *See State v. Thomas*, 158 S.W.3d 361, 413 (Tenn. 2005). In addition, a "prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence . . . by making predictions of the consequences of the jury's verdict." *Goltz*, 111 S.W.3d at 6. Moreover, a prosecutor should refrain from using epithets to characterize a defendant. *Thomas*, 158 S.W.3d at 414; *Cauthern*, 967 S.W.2d at 737. Such arguments reflect a clear disregard for long standing precedent. *See Middlebrooks*, 995 S.W.2d at 559; *Sparks v. State*, 563 S.W.2d 564, 569 (Tenn. Crim. App. 1978).

Nonetheless, we cannot say that the prosecutor's comments were so improper that they prejudiced the jury's verdict. First, the comments at issue were only a portion of the prosecutor's otherwise appropriate summation of the evidence presented at trial. Second, although no immediate curative measures were taken by the trial court, the court did admonish the jury in its charge to disregard any statements and arguments of counsel not supported by the evidence and to render a fair and impartial verdict. Finally, the evidence of the defendant's guilt presented at trial was substantial. Therefore, given these circumstances, we conclude that the prosecutor's improper comments do not warrant reversal. *See Thomas*, 158 S.W.3d at 414 (holding that the prosecutor's repeated personification of defendants as "greed and evil" was unseemly but did not undermine the fundamental fairness of the trial); *Middlebrooks*, 995 S.W.2d at 559-60 (holding that prosecutor's inappropriate remarks did not affect the verdict to the prejudice of defendant); *Cauthern*, 967 S.W.2d at 737 (holding that the prosecutor's repeated references to the defendant as "the evil one," though improper, did not affect the verdict to prejudice the defendant). Accordingly, Defendant Bryant is not entitled to relief on this issue.

## IX. Jury Instructions: Advanced Review

Defendant Bryant argues that the trial court erred in not allowing his counsel sufficient time to review the jury charge. While Defendant Bryant concedes that no precedent requires that the trial court give advanced notice of the proposed jury instructions, he submits that a better practice is for a trial court to provide a written copy of the proposed instructions prior to charging the jury in order that counsel might undertake meaningful review of the instructions and make timely objections or special requests where appropriate.

Rule 30 of the Tennessee Rules of Criminal Procedure provides in relevant part that:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adversary counsel. The court shall inform counsel of its proposed action upon the requests, and any other portion of the instructions concerning which inquiries are made, prior to their arguments to the jury. The court may, in its discretion, entertain requests for instructions at any time before the jury retires to consider its verdict.

. . . After the judge has instructed the jury, the parties shall be given opportunity to object, out of hearing of the jury, to the content of an instruction given or to the failure to give a requested instruction, but failure to make objection shall not prejudice the right of a party to assign the basis of the objection as error in support of a motion for a new trial.

In the instant case, the record shows that at the completion of the evidence, the trial court requested the parties submit any special requests in writing. Discussion then ensued as to what lesser-included offenses would be charged. During this discussion, the defense asked if the court could supply a copy of its proposed jury instructions. The court responded that its instructions were not in complete form, but that the instructions would not include "anything out of the ordinary." The next day, the court and the parties discussed at length their special requests and questions regarding proposed jury instructions.

Upon review, we note that Rule 30 does not require that the trial court give the parties a copy of its proposed jury instructions in advance.[5] Rather, Rule 30 only requires that the court inform the parties of its proposed action on the submitted special requests and portions of the instructions that are inquired by the parties. *See State v. McKinney*, 605 S.W.2d 842, 847 (Tenn. Crim. App. 1980). We also note that Rule 30 allows the parties to object after the trial court has instructed the jury, and preserves the parties' right to raise errors in their motion for a new trial. We further note that the proposed jury instructions were discussed at length in this case. It is not our role to create new procedural policy contrary to existing precedent. Rather, we are to review the record for errors in adherence to precedent. Accordingly, we discern no error and the issue is without merit.

### X. Jury Instructions: Reasonable Doubt

The defendants argue that the trial court improperly instructed the jury regarding reasonable doubt.

In criminal cases, a defendant has a right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). The failure to do so deprives the defendant of the constitutional right to a jury trial and subjects the erroneous jury instruction to harmless error analysis. *Id*. at 433-34. In evaluating claims of error in the jury charge, this court must review the charge in its entirety and read it as a whole. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).

The defendants contend that the reasonable doubt portion of the jury instruction was prejudicially erroneous for two reasons. First, the defendants argue that the trial court erred when it misread the definition of reasonable doubt. In its written instructions, the trial court's definition of reasonable doubt included the following:

> A reasonable doubt is just that – a doubt that is reasonable after an examination of all the facts of this case. If you find the State has not proven every

---

[5] We note, however, that the Advisory Commission Comments to Rule 30 states that "[t]his rule generally assures that counsel will know what the charge will contain before making the summation argument to the jury." In our view, the comments suggest that the better practice is for the trial court to allow the parties to review the proposed jury instructions prior to closing argument.

element, beyond a reasonable doubt, then you *should* find the defendant not guilty.

However, when reading the instructions to the jury, the trial court stated the following:

A reasonable doubt is just that – a doubt that is reasonable after an examination [of] all of the facts in the case. If you find the state has not proven every element, beyond a reasonable doubt, then you *can* find the defendants not guilty.

The defendants contend that the trial court lowered the state's burden of proof by stating the significantly less emphatic phrase "can find" instead of the proper imperative phrase "should find." The defendants argue that this error is one of constitutional magnitude.

While the defendants' argument on this issue is commendable in that it reflects knowledge and commitment to English grammar and construction, it is not illustrative of prejudicial error. Here the record clearly reflects that the jury was instructed on each charged offense and was told numerous times that the state must prove all the essential elements of each charged offense beyond a reasonable doubt. In addition, the jury was instructed numerous times that they had a duty to acquit if they had reasonable doubt as to the defendants guilt on each offense charged. Furthermore, the record reflects that the jury was provided a copy of the instructions containing the phrase "should find," and the trial court encouraged the jurors to re-read "any or all of it." Thus, in our view, the trial court's verbal mistake in the reading of thirty-five pages of jury instruction does not constitute error let alone constitutional error. Accordingly, the issue is without merit.

Second, the defendants argue that the trial court erred by not including the language "moral certainty" and "inability to let the mind rest easily as to the certainty of guilt" in its instruction on reasonable doubt. The defendants assert that when the trial court refused to instruct the jury on reasonable doubt as set forth in Tennessee Pattern Jury Instruction 2.03, the court violated their constitutional right to a correct and complete charge of the law.

The trial court gave the following instruction regarding reasonable doubt:

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all of the evidence in the case. It is not necessary that the defendant's guilt be proved beyond all possible doubt, as absolute certainty of guilt is not demanded by the law to convict of any criminal charge.

A reasonable doubt is just that -- a doubt that is reasonable after an examination all [sic] of the facts in the case. If you find the state has not proven every element, beyond a reasonable doubt, then you can find the defendants not guilty.

Upon review, we note that "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1,

-24-

5 (1994). Furthermore, "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id.* (citations omitted); *see also State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992) (holding that "[t]here is no requirement limiting a trial court to the use of 'pattern instructions'"). We further note that we have previously found no error in the trial court's refusal to include the "moral certainty" language in its reasonable doubt instruction. *See State v. Chett Allen Walker*, No. E2002-03093-CCA-R3-CD, 2003 WL 22258181, at *9 (Tenn. Crim. App., at Knoxville, Oct. 2, 2003); *State v. Leroy Nevils*, No. M2002-00411-CCA-R3-CD, 2003 WL 1787294, at *7 (Tenn. Crim. App., at Nashville, Apr. 4, 2003); *State v. Derek Denton*, No. 02C01-9409-CR-00186, 1996 WL 432338, at *8-9 (Tenn. Crim. App., at Jackson, Aug. 2, 1996). Therefore, it is our opinion that this instruction, taken as a whole, correctly conveyed to the jury the concept of reasonable doubt and did not violate the defendants' constitutional rights. *See Victor*, 511 U.S. at 5; *Pettyjohn v. State*, 885 S.W.2d 364, 365 (Tenn. Crim. App. 1994) (concluding that the court's instruction on reasonable doubt when viewed in full context "sufficiently described the degree of doubt necessary for acquittal and the degree of proof necessary for conviction."). Accordingly, this issue is without merit.

### XI. Jury Instructions: Defendant's Right Not To Testify

Defendant Bryant also argues that the trial court erred in instructing the jury as to the defendant's right not to testify. Specifically, Defendant Bryant submits that the trial court erred when it denied his request to change the word "failure" to "election" in the portion of the jury instruction addressing a defendant's right not to testify.

Upon review of this issue, we discern no error. The record reflects that the trial court read to the jury the following instruction regarding a defendant's right not to testify:

> A defendant is not required to take the witness stand in his own behalf, and his failure to do so cannot be considered for any purpose against him, nor can any inference be drawn from such failure of the defendant to take the stand in his own behalf.

After the jury was dismissed to deliberate, but before the written instructions were delivered to the jury room, the defendant requested that the trial court change the language from "failure to testify" to "elect not to testify" in accordance with Tennessee Pattern Jury Instruction 43.03. The trial court agreed to have the instruction re-typed per the defendant's request but informed the defendant that it would not re-read this instruction to the jury. The defendant agreed that re-reading this instruction would not be necessary.

Here, the trial court, upon the defendant's request, corrected this portion of the written instructions before sending them to the jury. As such, any perceived error in this portion of the jury instructions was cured by the court's corrective action. Moreover, we have previously found the aforementioned portion of the jury instructions originally read to the jury to be appropriate when

viewed in context with the entire jury instruction. *See State v. Davis*, 656 S.W.2d 406, 410 (Tenn. Crim. App. 1983), *judgment vacated and reinstated*, 1991 WL 155718 (Tenn. Crim. App. 1991); *State v. Keele*, 644 S.W.2d 435, 438 (Tenn. Crim. App. 1982) (citing *Yelton v. State*, 365 S.W.2d 877 (1963)). We conclude the same in this case. Consequently, this issue is without merit.

### XII. Jury Instructions: Lesser-Included Offense

Defendant Bryant argues that the trial court erred in refusing to instruct the jury on false imprisonment as a lesser-included offense of especially aggravated kidnapping.

In the instant case, the record reflects that the defendant properly requested false imprisonment as a lesser-included offense of especially aggravated kidnapping. However, the trial court denied the defendant's request and instructed the jury on aggravated kidnapping, kidnapping, and facilitation of a felony as the lesser-included offenses of especially aggravated kidnapping, the charged offense.

According to *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999), an offense is considered lesser-included of a greater offense if:

> (a) all of its statutory elements are included within the statutory elements of the
> offense charged; or
> (b) it fails to meet the definition in part (a) only in the respect that it contains a
> statutory element or elements establishing
> > (1) a different mental state indicating a lesser kind of culpability;
> > and/or
> > (2) a less serious harm or risk of harm to the same person, property
> > or public interest. . . .

*Id*. at 466-67. Whether instruction on a lesser-included offense should be given hinges upon whether the trial court, viewing the evidence most favorably to the existence of the lesser-included offense, concludes that (1) evidence exists that reasonable minds could accept the lesser-included offense, and (2) that the evidence "is legally sufficient to support a conviction for the lesser-included offense." *Id.* at 469. The failure to instruct the jury on lesser-included offenses requires a reversal unless the reviewing court determines that the error was harmless beyond a reasonable doubt. *See State v. Ely*, 48 S.W.3d 710, 727 (Tenn. 2001). Upon review, this court must determine "(1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." *State v. Allen*, 69 S.W.3d 181, 187 (Tenn. 2002). In making this determination, this court must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." *Id.* at 191.

Pursuant to Tennessee statute, the offense of especially aggravated kidnapping incorporates by reference and is defined by the offense of false imprisonment. *See* Tenn. Code Ann. § 39-13-305.

As such, we have held that false imprisonment is a lesser-included offense of especially aggravated kidnapping. *See, e.g., State v. Gerald L. Shirley*, No. E2002-03096-CCA-R3-CD, 2004 WL 34506, at *20 (Tenn. Crim. App., at Knoxville, Jan. 7, 2004); *State v. Newsome*, No. W2002-01306-CCA-R3-CD, 2003 WL 23100597, *6 (Tenn. Crim. App., at Jackson, Dec. 30, 2003); *State v. Evangeline Combs & Joseph D. Combs*, Nos. E2000-02801-CCA-R3-CD, E2000-2800-CCA-R3-CD, 2002 WL 31118329, *60 (Tenn. Crim. App., at Knoxville, Sept. 25, 2002). In reviewing the record, we determine that sufficient evidence existed to allow reasonable minds to accept the lesser-included offense of false imprisonment. Accordingly, we conclude that the trial court erred.

Having concluded that the trial court erred by failing to instruct the jury on false imprisonment, our final inquiry is whether that error is harmless beyond a reasonable doubt. *Allen*, 69 S.W.3d at 191; *Ely*, 48 S.W.3d at 727. The error may be harmless when the jury, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). In this case, the jury convicted Defendant Bryant of especially aggravated kidnapping to the exclusion of the lesser-included offenses of aggravated kidnapping, kidnapping, and facilitation. Accordingly, we conclude that the trial court's failure to charge false imprisonment was harmless beyond a reasonable doubt. The defendant is not entitled to relief on this issue.

## XIII. Sentencing

In the instant case, Defendant Bryant was convicted of fourteen counts of especially aggravated kidnapping, four counts of aggravated robbery, and one count of felon in possession of a handgun. He was sentenced to forty years for each of his especially aggravated kidnapping convictions, twenty years for each of his four aggravated robbery convictions, and four years for his conviction for felon in possession of a handgun. The trial court ordered seven of Defendant Bryant's especially aggravated kidnapping convictions to be served consecutively to his convictions for aggravated robbery and felon in possession of a handgun. As a result, Defendant Bryant received a total effective sentence of 364 years. Defendant Ezell was convicted of fourteen counts of especially aggravated kidnapping and four counts of aggravated robbery. He was sentenced to twenty-two years for each of his especially aggravated kidnapping convictions and eleven years for each of his four aggravated robbery convictions. The trial court ordered seven of Defendant Ezell's especially aggravated kidnapping convictions to be served consecutively to his convictions for aggravated robbery. As a result, Defendant Ezell received a total effective sentence of 198 years. Defendant Talley was convicted of ten counts of especially aggravated kidnapping and four counts of aggravated robbery. He was sentenced to twenty years for each of his especially aggravated kidnapping convictions and ten years for each of his four aggravated robbery convictions. The trial court ordered five of Defendant Talley's especially aggravated kidnapping convictions to be served consecutively to his convictions for aggravated robbery. As a result, Defendant Tally received a total effective sentence of 140 years.

Before a trial court sentences a convicted defendant, it must consider: (1) the evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing; (4) the arguments of counsel relative to sentencing alternatives; (5) the nature and characteristics of the criminal conduct involved; (6) any mitigating or enhancement factors; (7) any statements made by the defendant in his or her own behalf; and (8) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is also required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated in determining the sentence. *Id.* at 704-05.

Appellate review of a challenged sentence is a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the defendant has the burden of showing that the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. We will uphold the sentence imposed by the trial court if (1) sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210(f).

*Defendants Bryant and Ezell*

In their final issue, Defendants Bryant and Ezell cite *Blakely v. Washington*, 542 U.S. 296 (2004)[6] to argue that the trial court's imposition of consecutive sentences violated their Sixth Amendment right to a jury trial because the court made findings of fact without the intervention of a jury.[7] While the defendants acknowledge that the Tennessee Supreme Court in *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005) held that the Tennessee sentencing scheme does not violate the Sixth

---

[6]In *Blakely*, the United States Supreme Court held that a trial court could only increase a defendant's sentence beyond a statutorily defined maximum with facts found by a jury, facts admitted by the defendant, or with a defendant's past convictions. *Id.* at 303-04.

[7] The record reveals that the trial court relied on three factors in determining that consecutive sentencing was warranted in Defendant Byant's and Ezell's case – Defendants Bryant and Ezell were dangerous offenders and had an extensive criminal history; Defendant Bryant was a professional criminal. *See* Tenn. Code Ann. § 40-35-115(b)(1), (2) and (4).

Amendment right to a jury trial as interpreted by *Blakely*, the defendants submit that our supreme court did not resolve the precise issue of whether consecutive sentencing violates their constitutional right to a jury trial. They argue that consecutive sentencing controls the overall "length of time the offender is to be deprived of his freedom by physical confinement," and as such, consecutive sentencing violates their Sixth Amendment right to have a jury determine beyond a reasonable doubt the facts necessary to increase their sentences. The defendants also advance an alternative argument that *Gomez* was incorrectly decided in order to preserve this issue for federal review.

Upon review, we note that *Gomez* is binding authority. *Gomez* clearly holds that our sentencing scheme is non-mandatory; therefore, it does not does not violate the Sixth Amendment right to a jury trial. 163 S.W.3d at 658-62. In our view, our supreme court's rationale underlying its holding in *Gomez* encompasses and thus controls the issue of whether consecutive sentencing offends *Blakely's* prohibition against sentence enhancement derived from facts not authorized by a jury verdict or admitted by the defendant. *See id.* at 661. We also note that we have previously found that *Blakely* does not affect a trial court's consecutive sentencing determinations. *See, e.g., State v. Anthony Allen*, No. W2004-01085-CCA-R3-CD, 2005 WL 1606350, at *7 (Tenn. Crim. App., at Jackson, July 8, 2005); *State v. Earice Roberts*, No. W2003-02668-CCA-R3-CD, 2004 WL 2715316, at *12 (Tenn. Crim. App., at Jackson, Nov. 23, 2004); *State v. Lawrence Warren Pierce*, No. M2003-01924-CCA-R3-CD, 2004 WL 2533794, at * 13 (Tenn. Crim. App., at Nashville, Nov. 9, 2004). Accordingly, the issue is without merit.

*Defendant Talley*

In his final issue, Defendant Talley challenges both the length and manner of service of his sentence. The defendant first submits that the trial court improperly considered enhancement factors (1), (4), and (5), and improperly declined to consider mitigation evidence when sentencing him to twenty years for each of his especially aggravated kidnapping convictions and ten years for each of his aggravated robbery convictions.

Especially aggravated kidnapping is a Class A felony. Tenn. Code Ann. § 39-13-305(b)(1). The sentencing range for a Range I offender who commits a Class A felony is fifteen to twenty-five years. *Id.* § 40-35-112(a)(1). Aggravated robbery is a Class B felony. *Id.* § 39-13-402(b). The sentencing range for a Range I offender who commits a Class B felony is eight to twelve years. *Id.* § 40-35-112(a)(2). Applicable to Defendant Talley's case, the presumptive sentence for a Class A felony is the midpoint in the range while the presumptive sentence for a Class B felony is the minimum in the range. *Id.* § 40-35-210(c) (2003).[8] Procedurally, the trial court starts with the presumptive sentence, increasing the sentence within the range as appropriate based upon the

---

[8] Since the defendant's sentencing, Tennessee's sentencing scheme has been amended. Amendments include the renumbering of enhancement factors, omission of language designating a presumptive minimum sentence, and the indication that the application of enhancement factors is advisory not mandatory. *See* Tenn. Code Ann. §§ 40-35-114, -210. While we reference the amended enhancement factor numbers, any substantive changes reflected in these amendments do not apply to the defendant's appeal.

existence of enhancement factors and then reducing the sentence within the range as appropriate based upon the existence of mitigating factors. *Id.* § 40-35-210(d)-(e) (2003). The weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the statutory sentencing guidelines and its findings are adequately supported by the record. *See State v. Souder*, 105 S.W.3d 602, 606 (Tenn. Crim. App. 2002).

In imposing the defendant's sentences, the trial court found applicable enhancement factors: (1), the defendant has a previous history of criminal convictions or criminal behavior; (4), the victim of the offense was particularly vulnerable because of age or physical or mental disability; and (5), the defendant treated, or allowed the victim to be treated, with exceptional cruelty during the commission of the offense. *See* Tenn. Code Ann. § 40-35-114(1), (4), (5). The trial court also considered mitigating evidence: namely, that the defendant's family was supportive of him. However, the trial court found that the mitigation evidence carried little weight when "weighed against the horrendous facts of this case."

Upon review, we discern no error in the court's application of enhancement factor (1) and (5). According to the presentence report, Defendant Talley had two convictions for simple assault, one conviction for violating a protection order, and four convictions for drug possession. He also admitted that he smoked marijuana until he was locked up. Therefore, the court's application of enhancement factor (1) was appropriate. Likewise, enhancement was appropriate under (5), the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. The evidence at trial established that Defendant Talley participated in activity where some of the victims were beaten, burned with fire and bleach, then stuffed in car trunks to be killed in Mississippi.

However, the trial court's application of enhancement factor (4) is problematic. In applying this factor, the court noted the following:

> [F]or the record, in the event it wasn't adequately described at the time of trial because the jury was present, [Mr. Divin Wright] is a thin man who walks, has great difficulty walking as a result of an injury sustained, I believe, but I can't state that for certain. It may be disease related. But, whatever the cause he has extreme difficulty walking, he has extreme difficulty maintaining his balance. He needs assistance either by cane or by holding on to the rail in front of the jury box or on the edge of the table as he walks by, or having someone else hold him by the arm. He is not a normally healthy strong young man. And, his physical disability, in My [sic] judgment, clearly made him particularly vulnerable to the type of nightmare to which he was subjected on the night that this occurred.

The trial court's application of this factor is problematic because the court applied this factor based upon its personal observations of the victim without adequate proof in the record supportive of its observations. After reviewing thousands of pages of record, we found little evidence, if any,

establishing that Divin Wright was a particularly vulnerable victim.[9] As such, this court, as the reviewing court, is faced with a dilemma. On one hand, the trial court's observations and assessment that the victim was "particularly vulnerable" is to be accorded deference because the court is the trier of fact at the sentencing hearing, and the court had the opportunity to observe the victim firsthand. On the other hand, it is the state who bears the burden of proving that a victim is particularly vulnerable, and the trial court's findings of fact are to be adequately supported by the record. *See State v. Adams*, 864 S.W.2d at 35; *see also* Tenn. Code Ann. § 40-35-210(g).

To resolve this dilemma, we find this court's opinion in *State v. Raines*, 882 S.W.2d 376 (Tenn. Crim. App. 1994) to be instructive. In *Raines*, this court dealt with a similar situation and determined that the sentencing court was not permitted to predicate its finding of vulnerability upon its past observations of the victim because such action violated the rules of evidence applicable to sentencing hearings. *Id.* at 385. Accordingly, without adequate proof corroborating the trial court's observations and assessment of the victim's vulnerabilities in the instant case, we cannot but conclude that enhancement factor (4) was improperly applied to the defendant's sentence. To conclude otherwise is to hold that a trial court may base its determination of sentence enhancement solely on its own judicial notice of a particular fact. This, of course, would render appellate review of certain sentencing issues meaningless and fall contrary to provisions set forth in our sentencing statutes.

Notwithstanding our determination regarding improper application of enhancement factor (4), we conclude that Defendant Talley was appropriately sentenced. As previously noted, the record reflects the trial court properly applied enhancement factors (1) and (5). Additionally, the record indicates that the trial court properly considered the mitigation evidence but assigned it little weight. Accordingly, the trial court did not abuse its discretion when it sentenced the defendant to the presumptive minimum sentence of twenty years for his especially aggravated kidnapping convictions and ten years for his aggravated robbery convictions.

Defendant Talley next submits that the trial court erred in ordering him to serve his sentences consecutively. Citing *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the defendant asserts that the trial court failed to find that consecutive sentencing was necessary to protect the public against further criminal conduct and reasonably related to the severity of the offenses. Defendant Talley also asserts that the trial court erred by not considering his amenability to rehabilitation.

In ordering the consecutive sentences, the trial court found that the defendant was a dangerous offender and not amenable to rehabilitation. The court made the following statements:

---

[9] According to our supreme court, "the vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age. . . . The factor can be used . . . if the circumstances show that the victim, because of his age or physical or mental condition was in fact 'particularly vulnerable,' i.e., incapable of resisting, summoning help, or testifying against the perpetrator." *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993) (internal citations omitted).

[I]f there were any proof in this record to suggest that Mr. Talley [was] the type of individual that had made an effort over the years to rehabilitate himself or progress in life, [defense counsel's] argument would have more merit . . . . But, . . . [l]ooking at the pre-sentence report Mr. Talley was expelled from school in the tenth grade for disciplinary reasons. He has virtually no work history. He admits to having smoked eight blunts a day on a daily basis and the only reason he quit was he was locked up . . . . The proof that wasn't put before the jury but was part of the statements that were redacted was that he was announcing to Omar Coleman that this is a Gangster Disciple . . . arrest[.] [T]his is not an individual who looks like he was on a path toward getting his PHD in social work. This was an individual who was not doing a lot to contribute to this community. . . . [T]here are lots of programs . . . within the prison system that he can avail himself of if he so inclines. But, convincing me right now that he is a great candidate for rehabilitation is a harder sell. . . . As I indicated earlier, . . . [Talley] was an absolute and total willing participant in the events that took place. From the very beginning he was part and parcel of all the action. . . . And, to re-read this definition of dangerous offender, as a person whose behavior indicates little or no regard for human life, no hesitation about committing a crime in which the risk to human life is high. While it's true that he doesn't fit under any of the other categories, he clearly and absolutely fits under this category. . . . He had no regard for the lives of those four men [who] were stuffed into the trunks of those two cars, absolutely no regard for the lives of those men who were beaten and tortured and whose blood was still on the carpet, as reflected in those photographs. And, he is as much a dangerous offender . . . as anyone else [involved] in these events. . . . [T]o suggest that he's not a dangerous offender . . . does a disservice to what each of these victims was subjected to.

A trial court may impose consecutive sentencing upon a determination by a preponderance of the evidence that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. Therefore, pursuant to this code section, a trial court may impose consecutive sentencing if it determines that the "defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). If the trial court concludes that the defendant is a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4), it must also find that the consecutive sentencing reasonably relates to the severity of the offense committed and is necessary to protect the public from further criminal conduct by the defendant. *Wilkerson*, 905 S.W.2d at 939. Additionally, the trial court should consider general sentencing principles including whether or not the defendant is amenable to rehabilitation. *See* Tenn. Code Ann. § 40-35-103. It is within the sound discretion of the trial court whether or not to impose consecutive or concurrent sentences. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

While the trial court did not expressly recite the *Wilkerson* factors, the trial court's decision to impose consecutive sentences is supported by the record. The record reflects that Defendant Talley participated in the brutal beating and burning of the kidnapped victims. In our view, the

violent conduct in which the defendant participated supports the trial court's finding that the defendant qualified as a dangerous offender and was not amenable to rehabilitation. Given the violence Defendant Talley engaged in when committing the offenses of especially aggravated kidnapping and aggravated robbery, it is clear that consecutive sentences are necessary to protect the public and reasonably relate to the severity of these multiple violent offenses. Accordingly, the defendant is not entitled to relief on this issue.

*Merger of Kidnapping Convictions*

While only noted in footnote form, the defendants request that their especially aggravated kidnapping convictions be merged as the record clearly reflects that these convictions were based upon alternative theories of especially aggravated kidnapping. Upon review, we agree. Here, the indictments clearly indicate that the state charged the defendants with fourteen counts of especially aggravated kidnapping based on two alternative theories: that the defendants used a deadly weapon to either (1) knowingly remove the seven victims, or (2) knowingly confine the seven victims. In addition, the trial transcript reflects the prosecutor's intent to prosecute the especially aggravated kidnapping offenses under these two alternative theories. The record reflects that the jury found the defendants guilty under both alternative theories of especially aggravated kidnapping.

It is well settled that the constitutional right against double jeopardy protects against multiple punishments for the same offense. *See North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *State v. Phillips*, 924 S.W.2d 662, 665 (Tenn. 1996). When a jury convicts under alternative theories, "a merger and imposition of a single judgment of conviction protects against double jeopardy and preserves the validity of the jury verdicts for future avoidance of problems related to unnecessarily dismissed charges or convictions." *State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App.1997) (internal quotations omitted); *see also State v. Howard*, 30 S.W.3d 271, 274 n.4 (Tenn. 2000). Here, the record reflects that the trial court incorrectly included the same offense counts for especially aggravated kidnapping in the judgments of conviction; whereas, the court should have merged these same offense counts into a single judgment of conviction. Notwithstanding this oversight, the trial court properly omitted the same offense counts when imposing consecutive sentences. However, in order to avoid any future confusion, we remand this case back to the trial court to amend the judgments to reflect the merger of the same offense counts in the especially aggravated kidnapping indictments: Nos. 01-08323, 01-08324, 01-08325, 01-08326, 01-08327, 01-08328, 01-08329. Our remand does not affect Defendant Talley's acquittal as to indictment Nos. 01-08323 and 01-08324, neither will this remand affect the defendants' total effective sentence.

**CONCLUSION**

Based upon the foregoing review, we affirm the defendants' convictions and sentences. However, the case is remanded for correction in the judgments of conviction to reflect the merger of the same offense counts found in the indictments previously addressed in this opinion.

_____
J.C. McLIN, JUDGE